The clerk can call the final case. Mr. O'Malley, are you with us? Yes, ma'am. And Mr. Sosna? I am. Good morning. Great. Case number 20-3061. Case number 20-3081. Case number 20-3400. Kara Miller et al. versus Honkamp Krueger Financial Services. Very well. Mr. O'Malley, you may proceed. Thank you, Judge Shepard. May it please the court and counsel. We are here today on a restrictive covenant case where the district court, with a ruling from the bench, threw Ms. Miller out of from accepting business from clients who voluntarily elected to follow her to her new employer. Miller and Mariner, in today's appeal, respectfully request that this court reverse the court's two orders and allow Ms. Miller to get back to work. Now, this case involves, like I said, two separate orders, a non-compete order and a multiple reasons why this court could at least reverse, but at the very least, remand the case to the district court. But to make it simple, this court could reverse and should reverse the district court's orders based on two narrow issues that are both clear legal errors by the district court. One, Ms. Miller terminated her employment agreement and therefore terminated its non-compete obligations, and so those were dead and no longer survive. And second, that Ms. Miller's non-solicit agreement that prohibits her from accepting business from clients is unenforceable under South Dakota law and should have never been enforced. With those two holdings, the court can really ignore the rest of the disputes in this case, reverse, and send Ms. Miller back to work. That said, I'm going to focus today on three arguments taken a little bit out of order. First, the termination issue. Second, the acceptance of business issue. And then third, I'm going to return to the supersession issue with respect to the employment agreement. Now, I think the termination issue is probably the easiest and most simple for this court following both state court precedent and this court precedent. The bottom line is the contracted issue here, the employment agreement, it expressly allows for either party to terminate the agreement on written notice. And then the non-compete portion of that agreement does not contain any survival language. The contract overall contains no survival language. So simply as a matter of basic contract interpretation, the parties allowed the contract to be terminated on written notice. Ms. Miller terminated the contract pursuant to the agreement, and therefore the non-compete is dead. Honkamp may not like that result. It's a strange result, admittedly. Judge Schultz recognized in his decision that we quote in our flypapers, usually non-compete agreements have language that state the obligation to survive termination of the agreement and or termination of the employee's employment. This one does not. And that's something that Honkamp, the drafter of the agreement, simply has to live with. It was not the district court's job and it is not this court's job to rewrite the agreement in a way that would be helpful to Honkamp, the drafter. Now, I mentioned that that holding follows from specific cases that this court should follow. One of those is the Hawkeye Bank decision from the Iowa Supreme Court. Now, Hawkeye Bank held that a covenant does not serve, a covenant, a restrictive covenant does not survive an agreement's termination. That's exactly what happened here. Hawkeye Bank is directly on point. The district court here ignored the case. Judge Schultz, as you see in our quote in the reply brief, correctly applied the case. And we believe that the court should follow. And this shows that the agreement could and was terminated. In the boat dealers case, that involved an agreement that contained a term of years provision. And the court held that that sort of term of years contract can be extinguished upon the termination of the agreement if the contract allows that. And here the contract did. Now, if you look at the contract language, you'll see how clear it is that the parties could terminate it. Section two of the parties agree that either party may terminate the agreement on written notice. They did put a requirement of written notice on the termination, which Ms. Miller complied with. You compare that against section 11 of the agreement, where it says section two here of notwithstanding, employer may immediately terminate this agreement for certain reasons. So the agreement itself recognizes it can be terminated by either party on written notice, but notwithstanding that Han camp can also immediately terminate it, meaning without written notice, if certain things occur. So I think based on Hawkeye bank and the boat dealers case, it's unavoidable that the court find that Ms. Miller could and did terminate the employment agreement, thereby terminating the non-compete restrictions and the injunction enforcing the employment agreements non-compete was in error. And now turning to the acceptance of business issue from the agreement ancillary, Ms. Miller, the district court enforced against Ms. Miller, the ancillary agreement, despite the fact that the agreement was against public policy in South Dakota. South Dakota law to South Dakota Supreme court cases have specifically held that restricted covenant agreements that prohibit the mere acceptance of business violate South Dakota public policy. That's what Rosado health. And then following Rosado, that's what the communication tech systems court held inciting Rosado. The only thing we've heard in response to these controlling cases is that a later case dolly in beef products somehow reached different decisions. But if you look at the beef products case, it too held that a customer non-solicit violated South Dakota public policy because it prohibited acceptance of clients business. So the district court's ruling that the agreement ancillary was enforceable is violative of South Dakota public policy and therefore cannot be enforced. Now, turning back to the final issue, I'd like to focus on the super session issue. This again returns to the employment agreement and it's non-compete provision. The ancillary agreement, which was signed after the employment agreement, contains an integration clause that says that it supersedes all prior discussions and agreements between employer and employee with respect to the subject matter hereof. Now, I'll dive into what that means, the subject matter of hereof, but two background points are mentioning. One is again, this is a contract drafted by Han camp. Any confusion, any issues with it have to be resolved against Han camp. Second, we're dealing with restrictive covenants here, a disfavored contractual provision under both South Dakota and Iowa law, whatever law applies. So we have here a disfavored restriction being applied by the drafter of the agreement. Now, what do we make of the same subject matter of the agreement and ancillary's integration clause? Courts and statutes in both Iowa and South Dakota treat non-competes and customer non-solicits as two sides of the same unfair competition coin. And we know that as well, not just from the law and statutes, but from the agreement itself. Look at the employment agreement section nine, which is where the restricted covenants appear. That section nine is repeatedly referenced throughout the agreement as a particular section. And there are terms that are defined for that entire section. The non-compete and the customer non-solicit are all together part of that section nine. That section nine also contains a representations provision, section nine C, and it talks about the covenants as a whole, restricting the employee's right to compete. It also includes their remedies provision that references remedies for violations of section nine as a whole. Now, the only thing we've heard in response to this is the Hot Stuff Foods case, and that that somehow controls. That is very easily distinguishable. In Hot Stuff, the second consideration in the second agreement was being provided for in exchange for the restrictive covenants in the earlier agreement. It's specifically provided for that. And so, Hot Stuff's integration provision and its ruling is just different from here. Unless the court has questions now, I'm going to reserve the final five minutes of my time. I do have a question. Now, this is an appeal from a preliminary injunction, correct? Yes, Your Honor. So, now there are several factors that the court considers in deciding the question of a preliminary injunction, and one of them is probability that the movement will succeed on the merits, which sounds like what the bulk of your argument has been devoted to that element. But what about the other elements and the standard of review here? I mean, aren't there other considerations keeping in mind that this is a preliminary stage of the case and keeping in mind the deference and the standard of review that we're to apply here and the consideration of other factors? Is it really as simple as your argument is portraying it? Let me answer that in a few ways. First of all, you're correct that the database factors, there are four of them, and I've been focusing on the likelihood of success in argument. All four of those factors still need to be met, and I think the case law suggests that likelihood of success on the merits is one of the two most important of the database factors. With respect to the standard of review, while this was in a preliminary injunction phase, when the court makes clear legal errors, errors of law, errors of applying the case law, then this court can reverse based on those errors of law. The deference to the court's factual findings or the preliminary nature of the proceedings isn't necessary when the errors of law are clear like they are here. And the final thing I'd say is, Honkamp's request in this case really involved the exact same relief it's going to request at the end of the case, putting Ms. Miller out of work. And when the request is essentially the same as the final relief you can get at trial, Eighth Circuit case law says that a heightened status quo. You're putting Ms. Miller out of work for a year based on preliminary rulings, an incomplete record, and here, errors of law. All right. Thank you. Will you save the rest of your time for rebuttal? Yes. Yes. Thank you. All right. Thank you very much. Mr. Sosna. Good morning, Your Honor. I'm Jeremy Sosna. May it please the court. I represent the Appalachian Honkamp Kruger Financial Services, Inc. in this matter. And I would submit that what appellants are asking the courts to do here is to substitute this court's judgment for the judgment of the district court. The district court carefully considered the application for the preliminary injunction, and after a two-day hearing, applying the dataface factors, properly determined that a preliminary injunction was warranted in this case. And the aptly respectfully request that the court affirm that decision and deny the request to vacate the preliminary injunction or remand the case back to the district court. The case that the appellant's counsel would like the court to in the briefing is not really the case that's before this court. What we have here is we have Ms. Miller, who had an employment agreement and an agreement ancillary with Honkamp Kruger. She resigned her employment, immediately began competing, minutes later began competing with her former employer in violation of the employment agreement and the non-compete, and immediately began soliciting clients that she had specifically serviced in the exact same prior to the time that she left. The district court, Judge Schreier, properly determined that these agreements were enforceable, and that Ms. Miller's employment with and solicitation of clients on behalf of Mariner was a breach, and this was faithful to the dataface standards. And the appellants have not shown that the district court abused its discretion or that was a clear error of law. I think what would be helpful is to address the issues that Mr. O'Malley has raised, because I think each of them can be dispatched with relative ease. Let's first talk about the termination argument. Again, the case that Mr. O'Malley has described is not the case before the court. What happened here is Ms. Miller resigned her employment, and four days later, purported to attempt to terminate the agreement. So for this four-day period, what she'd like the court to do is to invalidate the fact that she resigned her employment and ended her employment, and that the agreement clearly states that for a two-year period after that time period, she's prohibited from competing. I'm sorry, one year period after that. So the facts don't actually match up with the case law that Mr. O'Malley has cited to the court. I'd also submit that the interpretation that the district court here gave to this contract was entirely reasonable and consistent with the language of the contract. The contract contains multiple instances that would demonstrate that there was an intention of the parties for the term of the agreement, for the to have used some magical language that specifically says that the restriction would extend. But the language in paragraph 9, in particular in paragraph 9b, specifically does that. It specifically indicates that the restriction on her ability to compete was to extend beyond the period of the contract. And I'll talk about that here in a moment, but I think it's important to understand that there is language in this contract that specifically indicates that the intended that there were to be some post-employment restrictions on Ms. Miller. And under basic contract interpretation tenets, the court has to give that some meaning. If the court disregards it in its entirety, the idea of these restrictions extending beyond the termination are written out of the contract. And of course, under contract interpretation standards, the court must interpret this contract in a way that would give all of the provisions meaning. And the only way to do that would be to conclude that this is an intent by the parties to have that restriction survive the termination both of employment and of the contract. I think one of the ways that the court can come to that conclusion, and the district court properly came to that conclusion, is looking exactly at the paragraph that Mr. O'Malley has raised and appellants have pointed to, which is paragraph 2. Paragraph 2 is the term of employment. It specifically is about the employment being at will, meaning that's the term of the employment. And then it uses an important word, which is however. Now that however must reference the employment. And what that is stating is that the agreement and the employment are coterminous. And that's, of course, evident by the fact that the agreement itself is titled an employment agreement. There's no possibility that when you terminate your agreement, that the employment can continue. And therefore, when they're coterminous, what that means is those restrictions were intended to extend beyond both the termination of the agreement and the termination of the employment. I'll turn just to the Hawkeye case briefly, because again, that is not a case that provides support to Ms. Miller or Mariner's position in this case. The Hawkeye bank case in Iowa has no language in it that suggests that a contract must specifically contain a survival clause. That's not what it says. In fact, there's no case law from Iowa that the appellants have cited that would support that tenet. What the Hawkeye case does is it has an entirely different set of facts. So the contract there had a restriction that occurred during the term of the contract. There was nothing in the contract that provided for a restriction that extended beyond the end of the contract. And that's very different, of course, from here. And so all the court in Hawkeye bank said was that the restriction that the plaintiff in that case wanted to extend in ultimately perpetuity ended at the end of the contract because it was only appellants have cited are equally distinguishable on the same grounds that we've already talked about, which is Ms. Miller began her competition before she terminated the contract. So the Burke case is factually distinguishable as are the other cases that the appellants have cited. I'll turn to the issue of acceptance of business under the contract. First, I think what would be is that Iowa law applies to both of these contracts. And Iowa law specifically would permit and allow for a restriction on Ms. Miller to accept business. And I would direct the court to the Amex case, which specifically supported and enforced in the financial services industry, in which the same industry in which we're talking about here, restrictions on acceptance of business under Iowa law. But that restriction is also not inconsistent with the Rosado case or Dolly or the statute that's at issue here. So the Dolly case and Rosado both involved cases involving the insurance industry and the South Dakota legislature in its wisdom determined that there is a difference. In fact, that is exactly why they enacted a separate statute regarding restraints on trade in the insurance business. And that difference is important. So in this context, Ms. Miller was an employee of Heimkamp Kruger. In Rosado and in Dolly, there was no employment relationship between the insurance company and the agent that they were trying to restrict. And in fact, there was really no relationship between the insurance company and the end user clients of the agent, which is the insured individuals. That relationship is between the insurance agent and their clients. And in that context, there's certainly a reason to prevent the insurance company, effectively a third party, from coming in and preventing that relationship between the agent or the agency and its clients. It's very different than the circumstance here where Ms. Miller was compensated very over a long period of time to develop and maintain relationships, not on behalf of herself, but on behalf of the Heimkamp Kruger, the company itself. And in that context, we have a very different situation. I'd also point out that Dolly, in fact, makes this exact point in terms of showing the difference between the insurance industry and the general industry in which Ms. Miller worked in. In that case, the reference to the definition of solicitation goes back to a specific definition of solicitation in South Dakota law relating solely to the insurance industry. So those cases do not really apply here. And the district court was well within its discretion and did not abuse its discretion in determining that the acceptance of business was not prohibited, was not contrary to South Dakota law, and was consistent with Iowa law and applied Iowa law to enforce that restriction. And again, there's no material dispute here that Ms. Miller's employment with Mariner is in violation of the non-compete, and there's no dispute that Ms. Miller has accepted business in violation of that provision. And thus, the district court's decision in that regard was entirely appropriate. I'll turn last to the supersession argument. I think that the language of the agreement makes it abundantly clear that there was an intent of the parties to simply call for the anti-piracy provisions to supersede the non-solicitation. Now, what the appellants would like this court to do is to conflate the idea between non-solicitation and non-compete agreements, but that's not how courts have viewed this. And I would direct the court to the Wachovia Securities case, which makes this point. And it makes the point in this way. It shows that non-compete and non-solicitation agreements are different in character. And the way that they do that is they apply, and they specifically have to come to that conclusion that the standards for enforceability of non-solicitation provision is the same as the enforceability of a non-compete agreement. If they were one and the same, the court would never have had to come to that point. And so that's an important distinction here. That's why the Farm America case, an unpublished decision from Pennsylvania, is not particularly persuasive here, because it makes the same error. It conflates non-compete and non-solicitation agreements and treats them one and the same. They're not. And so then when you look at the agreement in Ancillary, which has very limiting language in terms of what is in fact going to be, what's going to be superseded, it only is to the issues that are addressed in that specific contract. And the only thing that's the anti-piracy slash non-solicitation provisions. And so we would suggest to this court that the district court did not abuse its discretion, certainly did not make it some manifest error of law that would result in the court here replacing its judgment for the judgment in the discretion of the district court. I think it's important to make one final point here with regard to the issues that have been raised. And I want to bring this up because there's been the motion to file for the supplemental record. And I think it's important to note that this was, of course, an improper way to bring this before the court. The proper way under the rules is to address it with the district court, which was not done, or to seek an agreement by the Appalachians to have these additional emails added to the record. But it's not unusual in the course of a case involving a preliminary injunction that during the course of discovery, one side or the other will discover evidence and have an evidence produced to it that it believes should render a different conclusion for the court, for the district court. That's, of course, why we have the data phase factors in the first place, which is that this is not the opportunity and not the opportunity for the appellee, in this case, Han Kim Kruger, to prove its case on the merits. The purpose of data phase is simply to show that there is some basis for the claim and the district court properly found here that that was the case here. Of course, there's going to be additional evidence that will come out through the course of discovery, and that might lead the court ultimately to a different conclusion or the jury to a different conclusion. But that's not a basis to supplement the record. And in fact, if that were the standard, then there would be a never-ending cycle during the course of discovery where evidence that one side believes supports its position and the other side does not would come back to the district court, and there would be a never-ending cycle of appeals on those decisions. And so it's our view that this should never be added to the record. But I do think it's important. It further demonstrates that the district court, in fact, did not abuse its discretion. Apparently, by submitting this evidence, the appellants are arguing that the contract is ambiguous and the court should consider additional evidence to determine the intent of the parties. Well, if the contract is in fact ambiguous and the district court determined what the intent of the parties was based on the evidence that was submitted, then it surely could not have abused its discretion. This case is not difficult. This is a straightforward decision by the district court that a preliminary injunction against a woman and her new employer who are in clear violation of their agreements with Ancamp-Kruger should be joined from doing so. And we would respectfully request that this court affirm that decision and deny the request of the appellants. Thank you, Your Honors. Mr. O'Malley. Thank you. I'm glad that my opposing counsel referenced the concept that you can't write out of an agreement terms that appear in the agreement. And based on Honkamp's view, Section 2 would be written out of the agreement. Section 2 can't be more clear. The parties agree that either party may terminate the agreement on written notice. Once the agreement is terminated, it's dead. There's no survival language as to the non-compete. It's dead. The other sections of the agreement confirm that. The confidentiality provision says, during the term of this agreement and after. So it contemplates continuing obligations. Could you address the argument that Rosado is limited to the insurance business? Sure. The Supreme Court of South Dakota subsequently held in communication technical systems that Rosado says that prohibitions on accepting clients are not permitted under South Dakota law. Communication tech systems was a dispute between two computer hardware companies. So we have the South Supreme Court specifically holding that Rosado is not limited to the industry context. And when you have that South Dakota case showing that the agreement violates South Dakota public policy, the agreement's choice of Iowa law no longer applies. With respect to supersession, I still haven't heard any case from Honkamp that supports the argument. Hot stuff doesn't apply. They cited Recker. It doesn't apply. They cited Fuller, a 90-year-old case about novation. It doesn't apply. And finally, with respect to the new evidence, in this instance, there were suggestions to the district court that were relied on by the court that things existed that actually didn't exist. And so that's why these emails are relevant. I'd finally close with, we believe the two orders should be reversed. At the very least, they should be remanded, at least with respect to the enforceability of the non-compete, because we argued to the district court that the non-compete was unenforceable as written, and the district court didn't even address that issue. Thank you, Your Honor. Very well. Thank you, counsel. The case is submitted, and the court will render a decision in due course.